Ex. A

# EXHIBIT A

Excerpts of transcript of the December 7, 2018 deposition of Dean Meyer, Rule 30(b)(6) witness for Federal Home Loan Mortgage Corporation

Ex. A



# Transcript of Dean Meyer, Corporate Designee

**Date:** December 7, 2018
**Case:** SFR Investments Pool 1, LLC -v- Washington Mutual Bank

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

Transcript of Dean Meyer, Corporate Designee
Conducted on December 7, 2018

---

**Page 1**

```
1              DISTRICT COURT
2            CLARK COUNTY, NEVADA
3   - - - - - - - - - - - - - - - - - - -x
4   SFR INVESTMENTS POOL 1, LLC a        :
5   Nevada limited liability company,    :Case No.:
6          Plaintiff,                     :A-12-672769-C
7   v.                                    :
8   WASHINGTON MUTUAL BANK, a Federal    :DEPT NO. 28
9   Association, JP MORGAN CHASE BANK, NA, :
10  MTC FINANCIAL, INC dba TRUSTEE CORPS, :
11  a California Corporation, and         :
12  GREGORY COOPER, an individual;        :
13  DOES I through X, ROE CORPORATIONS    :
14  I through X, inclusive,               :
15        Defendants.                     :
16  - - - - - - - - - - - - - - - - - - -x
17
18        Videoconference Deposition of FREDDIE MAC,
19      By and through its Designated Representative,
20              DEAN MEYER
21            McLean, Virginia
22         Friday, December 7, 2018
23  Job No.: 219469          2:03 p.m.
24  Pages: 1 - 67
25  Reported by: Lisa Kirk
```

---

**Page 2**

```
1          Deposition of DEAN MEYER, held at
2   the offices of:
3          PLANET DEPOS - TYSONS CORNER
4          8270 Greensboro Drive
5          Suite 110
6          McLean, Virginia 22102
7          888.433.3767
8
9
10
11         Pursuant to Notice, before Lisa Kirk,
12  Court Reporter and Notary Public in and for the
13  Commonwealth of Virginia.
```

---

**Page 3**

```
1            A P P E A R A N C E S
2   ON BEHALF OF THE PLAINTIFF:
3       JASON MARTINEZ, ESQUIRE
4       KAREN HANKS, ESQUIRE
5       Kim Gilbert Ebron
6       7625 Dean Martin Drive
7       Suite 110
8       Las Vegas, Nevada 89139
9       702.485.3300
10      (Via videoconference.)
11
12  ON BEHALF OF FREDDIE MAC:
13      JOHN H. MADDOCK, III, ESQUIRE
14      McGuireWoods LLP
15      Gateway Plaza
16      800 East Canal Street
17      Richmond, Virginia 23219
18      804.775.1000
19
20      TIFFANY JOSEPH GOODSON, ESQUIRE,
21      Freddie Mac
```

---

**Page 4**

```
1            C O N T E N T S
2   EXAMINATION OF DEAN MEYER
3                              PAGE
4       By Mr. Martinez        5, 63
5       By Mr. Maddock         59
6
7
8
9
10          E X H I B I T S
11      (Attached to the transcript.)
12  MEYER DEPOSITION EXHIBIT        PAGE
13      Exhibit 1  Chase_Cooper_FHLMC00001 -    65
14                 Chase_Cooper_FHLMC00007,
15                 Chase_Cooper_FHLMC00059,
16                 Chase_Cooper_FHLMC00060,
17                 Chase_Cooper_FHLMC00069,
18                 Chase_Cooper_FHLMC00115,
19                 Chase_Cooper_FHLMC00116
```

Transcript of Dean Meyer, Corporate Designee
Conducted on December 7, 2018

2 (5 to 8)

**Page 5**

1          P R O C E E D I N G S
2    Whereupon,
3              DEAN MEYER,
4    being first duly sworn or affirmed to testify to the
5    truth, the whole truth, and nothing but the truth,
6    was examined and testified as follows:
7          EXAMINATION BY COUNSEL FOR THE PLAINTIFF
8    BY MR. MARTINEZ:
9    Q    (Inaudible.)
10         (The court reporter requested that Counsel
11   repeat the question.)
12   Q    Good morning.  My name is Jason Martinez.
13   I represent SFR Investments Pool 1, LLC.  In the
14   room with me is Karen Hanks.  She also represents
15   SFR.  Could you please state and spell your name for
16   the record?
17   A    So Dean Meyer; D-E-A-N, M-E-Y-E-R.
18   Q    And what is your current occupation?
19   A    I work for Freddie Mac.
20   Q    And what's your title with Freddie Mac?
21   A    Director of loss mitigation.
22   Q    And just as a preliminary matter, there
23   were a number of documents that we had sent over.  I
24   just want to make sure you have all those documents
25   in front of you.  There should be six sets, I think.

**Page 6**

1    A    So I have two copies of a set of documents.
2    Q    Perfect.  And just so I make sure that I
3    have the same thing in front of me with you,
4    (inaudible).  Documents printed.  There will be
5    something called a Bates stamp and in this
6    circumstance it starts with Chase, underscore,
7    Cooper, underscore, FHLMC, and it has a series of
8    numbers after that.  Do you have that in front of
9    you?
10   A    So none of the documents I have have a
11   Bates stamp on them.  Or some of the documents,
12   okay.
13         MR. MADDOCK:  This is John Maddock on behalf
14   of Freddie Mac.  The deed of trust and corporate
15   assignment of deed of trust are not
16   Bates-numbered.
17   Q    Okay, but the other four, I guess, sets of
18   documents are Bates-stamped, correct?
19   A    That's correct.
20   Q    And can you tell me the Bates stamps, just
21   so we're on the same page?  It looks like to me
22   there's a grouping that starts at that Bates stamp I
23   just relayed (phonetic) to you, but I'm going to
24   refer to that by the numbers themselves.  I'm not
25   going to repeat that whole Bates stamp every time,

**Page 7**

1    but it says FHLMC1, and then that one runs through
2    7.  And I have --
3          MR. MADDOCK:  Let me stop you there.  This
4    is John Maddock.  The copy -- we have a document that
5    has Bates numbers 1 through 5.  And then there are
6    two pages -- the last two pages, it appears that the
7    right-hand side is cut off, so it's impossible to
8    tell if there are Bates numbers.
9          MR. MARTINEZ:  Does it -- the last two
10   documents you're referring to with the Bates numbers,
11   does it look like it's a spreadsheet of some sort?
12         MR. MADDOCK:  Yes.
13         MR. MARTINEZ:  Okay.  And then just -- it
14   looks like it has columns that run A through M on the
15   one page and A through P on the second page?  You
16   might have some of that cut off, but at least we're
17   on the same page.
18         MR. MADDOCK:  Yes, we have columns A through
19   J on both pages.
20         MR. MARTINEZ:  Okay.  And those documents,
21   for purposes of the depo, so that we're clear -- the
22   document that starts -- the first column, A, is --
23   it's I-D, underscore, loan, underscore, S-Y, S-T,
24   underscore, G-E-N-D.  That one will be -- that one is
25   Bates-stamped as FHLMC6.  If you want to put that on

**Page 8**

1    a document (inaudible) --
2          (The court reporter requested clarification
3    regarding the question.)
4    Q    If you want to make a note on the actual
5    document, that's fine.  I just need to make sure you
6    see that, so that what we're referring to in the
7    deposition is clear on the transcript.
8          Then the second spreadsheet, the column
9    heading is a heading of NBR_LOAN_MIDAS; is that
10   correct?
11   A    Yes.
12   Q    Okay.  It's got four rows.  That one is
13   Bates-stamped as 7.  And then I have, essentially,
14   three other groupings of documents I want to make
15   sure you guys have.  The next set in sequential
16   order, it starts with Bates stamps 59 and 60.
17   A    Yes, I have that.
18   Q    Okay.  And the one after that is a single
19   page that's Bates-stamped 69?
20   A    Yes.
21   Q    And then the final remaining two pages,
22   Bates-stamped 115 and 116?
23   A    Yes.
24   Q    Perfect.  All right.  So let's start
25   with -- first I actually want to look at the one

Transcript of Dean Meyer, Corporate Designee
Conducted on December 7, 2018

**9**

1 that's Bates-stamped 59 and 60. There's a large
2 redaction on the page that's mostly blacked out.
3 (Inaudible.)
4     (The court reporter requested clarification
5 regarding the question.)
6   Q   Just look at that one for me.
7   **A   I have it.**
8   Q   Okay. And then up at the top it says,
9 Freddie Mac Funding Details Report, and it indicates
10 that there's a seller name there and refers to
11 Washington Mutual Bank, correct?
12   **A   Yes.**
13   Q   And that -- the next line down says seller
14 identifier. Can you tell me what that six digit
15 code means?
16   **A   It's just a code that identifies who the**
17 **seller was. It's a code that we assign to an**
18 **individual seller. So in this case, seller -- that**
19 **ID is associated with Washington Mutual Bank.**
20   Q   Okay. And that seller identification
21 number is unique to Washington Mutual, correct?
22   **A   Yes.**
23   Q   So what I mean by that, just to clarify, is
24 that no other entity can carry the same seller
25 identification number in Freddie Mac's system,

**10**

1 correct?
2   **A   No, that's not correct.**
3   Q   Can you clarify, because maybe the question
4 was confusing.
5   **A   So --**
6   Q   Washington carries the seller
7 identification number 145046, correct?
8   **A   They did at the time this loan was sold to**
9 **Freddie Mac.**
10   Q   Okay. Does somebody else maintain that
11 seller identification number now?
12   **A   So in the case of Washington Mutual, when**
13 **Chase purchased the assets from the FDIC of WAMU,**
14 **Chase took over that identification number.**
15   Q   Okay. So do you know what date that
16 transfer occurred where the identification number
17 listed on this document, which refers to
18 Washington Mutual, was then transferred to
19 JPMorgan Chase?
20   **A   So I believe it was in 2008, when the FDIC**
21 **transferred the assets of Washington Mutual to**
22 **Chase.**
23   Q   Do you remember the specific date for that?
24   **A   I do not recall, but I know it's published**
25 **on FDIC's website.**

**11**

1   Q   Okay. And in Freddie Mac's system, is
2 there any way to tell the date that that number no
3 longer identified Washington Mutual and started to
4 identify JPMorgan Chase?
5   **A   Yes. So in one of our systems or in the**
6 **reports that we maintain would show the conversion**
7 **from Washington Mutual to Chase.**
8   Q   And has that document -- is that document
9 sitting in front of you today?
10   (The court reporter requested that Counsel
11 repeat the question.)
12   **A   No.**
13   Q   Okay. Can you tell me what that
14 document is called or what system that would be in?
15   **A   It would more than likely be another field**
16 **within the MIDAS system.**
17   Q   And what would that field be?
18   **A   I don't know the name of it. They would**
19 **track it somewhere within that system. The data**
20 **from that would come from our corporate data**
21 **warehouse, which would maintain the history of that**
22 **identification number.**
23   Q   Okay. So that's -- effectively, that is a
24 change log, I guess you can put it, for this
25 identification number? It would show anybody who

**12**

1 has been assigned to that number throughout the
2 history of that number?
3     MR. MADDOCK: Objection, form.
4   **A   We would have record to reflect the timing**
5 **of any change of name for any specific ID.**
6   Q   Okay. And that system that basically
7 tracks changes made in the MIDAS system, or whatever
8 field you're referring to, does that track any other
9 changes within the MIDAS system other than just
10 seller identification numbers?
11   **A   So, again, so it would be a field in the**
12 **MIDAS system, which is -- the data comes from our**
13 **corporate data warehouse. So it would just populate**
14 **that information within MIDAS when the**
15 **identification number had a change made to it in the**
16 **name of it.**
17   Q   I understand what you're getting at. What
18 I'm asking is, is there a separate field or way that
19 I could look into the MIDAS system to tell when that
20 change occurred? Other than knowing that it pulls
21 from a different set of data -- I understand that --
22 I'm asking is there a way for me to see, you know,
23 September, whatever, 2008, identification number
24 goes from Washington Mutual to JPMorgan Chase? Is
25 there a way for me to see that?

Transcript of Dean Meyer, Corporate Designee
Conducted on December 7, 2018

---

**13**

1    A   So we --
2        MR. MADDOCK:  Objection, form.
3    A   So we would have records that would be able
4    to reflect the change and the name from
5    Washington Mutual to Chase.
6    Q   Okay.  And that's a system you're referring
7    to that you don't have a name for?
8    A   I believe it's -- it -- one of the places
9    it's referenced is MIDAS, but I would have to check.
10   But I believe that's one of the places that would
11   reflect that change.
12   Q   Okay.  And then, now, around the scope of
13   that, that system that you're talking about that
14   reflects changes in the MIDAS system, does that
15   system reflect changes in other areas other than the
16   seller identification number?
17   A   No.  Again, it's not reflecting change.
18   It's just populated with data from our corporate
19   data warehouse that would identify the change in
20   that ID.  So if there were changes in other areas of
21   MIDAS, that would be reflected in other screens
22   within MIDAS.
23   Q   So when you're referring to that, are you
24   saying that if they make a change in corporate data
25   warehouse, as you put it, that will now reflect on

**14**

1    the MIDAS system, correct?
2    A   So, again, MIDAS would reflect what
3    information is related to that -- in this case, the
4    identification number for that ID.  That data that
5    hosts that information is our corporate data
6    warehouse.  So from the corporate data warehouse it
7    would just automatically populate that change within
8    MIDAS.
9    Q   Okay.  That, I understand.  I get that.  So
10   then, essentially, what happens is that after that
11   identification number is reassigned to
12   JPMorgan Chase, all of the places in MIDAS where
13   that identification number comes up are going to
14   represent JPMorgan Chase, correct?
15   A   That's correct.
16   Q   Okay.  Now, what I'm getting at is, is
17   there an independent way for me to tell exactly on
18   what date that change occurred, meaning that it
19   shows Washington Mutual on, you know, prior to X
20   date and then post that date, it shows that it's
21   been changed to JPMorgan Chase?  Is there a way for
22   me to tell?
23   A   So I'm not 100 percent sure if that would
24   be reflected in MIDAS because MIDAS would reflect
25   what is currently in the corporate data warehouse

**15**

1    for that particular ID, but we would have records
2    that would reflect the timing of the change in the
3    name for that specific seller ID.
4    Q   Okay.  And what types of records would
5    those be?
6    A   I would not be able to speak to exactly
7    whether they would be in a report, whether they
8    would be in a log, or whether they would be in
9    another system that would house that -- reflect that
10   change, but we would have that.
11   Q   Would you review that type -- those types
12   of documents or anything like that before today's
13   deposition in order to testify as to how those
14   changes were made?
15   A   If I was -- felt that that was something
16   that was material, then I would review those
17   documents, yes.
18   Q   Well, I mean, you already testified that
19   the seller identification number changed from WAMU
20   to JPMorgan Chase, so did you review something in
21   preparation for your deposition today that led you
22   to that conclusion?
23       MR. MADDOCK:  Object, asked and answered.
24   A   So yes.  So the Funding Details Report
25   identifies Washington Mutual Bank as the --

**16**

1    references that ID.  The MIDAS screens, which would
2    show that same ID as a seller, now reflects Chase as
3    the entity associated with that ID.  So I know that
4    there was a change.  And I know from my knowledge
5    that at the time of when the servicing transferred
6    from Washington Mutual to Chase through the sale of
7    WAMU's assets from the FDIC to Freddie Mac, that's
8    when that change would have occurred, but I did not
9    look at any records within Freddie Mac to verify the
10   exact date.
11   Q   I want you to take a second to look at the
12   second page of the document we just referred to as
13   Bates-stamped 60.
14       MR. MARTINEZ:  For the record, for the most
15   part this document is almost entirely redacted except
16   for what appears to be one line on Bates stamp 60.
17   Q   Now, we just talked about the seller
18   identifier we were referring to on the previous
19   page.  Is that different than what is in that first
20   column, which is identified as a seller loan
21   identifier?
22   A   Yes.
23   Q   Okay.  What is a seller loan identifier?
24   A   So each seller would have a unique loan
25   number assigned to the loan when they sell it to us.

---

**17**

1  So that is the seller's identification for this
2  individual loan when it was sold to Freddie Mac.
3  Q   Okay.  And does that number ever translate
4  to anywhere else in the MIDAS system that I would be
5  able to track it that way?
6  A   Yeah.  So whenever there is a servicing
7  transfer and the new servicer assigns it its own
8  unique identifier loan number for that loan, then
9  MIDAS or our corporate data warehouse would update
10 what that identification number is, and that would
11 feed into MIDAS.
12 Q   Okay.  And I have a question.  I want you
13 to put another document next to this one so we can
14 compare the two.  It's the one that is Bates-stamped
15 115 and 116.  First off (inaudible).
16 (The court reporter requested clarification
17 regarding the question.)
18 Q   Do you have 115 and 116 in front of you?
19 A   Yes, I do.
20 Q   Okay.  Can you tell me what 115 represents?
21 Well, there's two screenshots on this page, so can
22 you tell me what this screenshot is?
23 A   So these are screenshots of our business
24 records from our MIDAS mainframe system.
25 Q   Okay.  Are they from a particular part of

**18**

1  the MIDAS system?
2  A   No.  It's the -- the header on here is
3  called -- it's the loan basic inquiry, so that is
4  a -- a screen that has loan-basic information on an
5  individual loan.
6  Q   Okay.  So this -- and it looks like -- and
7  I'm just looking at the screenshot at the top
8  left-hand corner.  It says page 1 of 2?
9  A   That's correct.  So the top screen is
10 page 1; the bottom screen is page 2.
11 Q   Okay.  And then, now, that seller loan
12 identifier that we were talking about that's on
13 Bates stamp 60, is that located anywhere on
14 Bates stamp 115?
15 A   Yes.  If you look in the left-hand column
16 by, like, the third row down, it says seller number.
17 That would house the seller number for who sold us
18 that particular loan.
19 Q   And in this circumstance it looks like that
20 number is 145046.
21 (The court reporter requested clarification
22 regarding the question.)
23 A   So I believe that's correct.
24 Q   Okay.  And that matches the seller
25 identifier number on Bates stamps 59, correct?

**19**

1  A   Yes.
2  Q   Okay.  Now, this seller loan identifier,
3  which is in the first column on page 60, is that
4  number anywhere on Bates stamp 115?
5  A   So yes.
6  Q   Can you tell me where it is on that
7  document?
8  A   So on the right-hand side, where it says
9  SSR loan number, that would be the seller/servicer
10 loan number, and that would be the loan number that
11 the current servicer is using, identifying this loan
12 in their system.
13 Q   Okay.  And that -- the last four of that is
14 9547, and that matches up with the first column on
15 Bates stamp 60?
16 A   Correct.
17 Q   Okay.  So, now, let's go back.  I was just
18 trying to match the numbers up.  Can we go back to
19 Bates stamps 59 and 60; just because I didn't ask
20 this question broadly in the first instance.  What
21 does the Freddie Mac Funding Details Report
22 generally show?
23 A   So the funding detail report is created
24 when a seller, in this case Washington Mutual Bank,
25 sells, in this case, a pool of loans to Freddie Mac

**20**

1  at any particular day.  It identifies who the seller
2  was.  And then the parts that are redacted on the
3  two pages, every single row is another unique loan
4  that we purchased at the same time from
5  Washington Mutual.
6  Q   Okay.  And is there any way to tell by
7  looking at Bates stamps 59 and 60 the exact date
8  that Freddie Mac allegedly acquired this loan from
9  WAMU or Washington Mutual?
10 A   So the Funding Details Report is not
11 time-stamped.
12 Q   Okay.  Do you know when this
13 Funding Details Report was generated from the MIDAS
14 system in order to be produced in this litigation?
15 A   So the Funding Details Report is not
16 generated from MIDAS.  It is a report that is
17 generated when the loan is sold to us from the --
18 our selling system.  So when the servicer transmits
19 the data for all the loans they are selling to us,
20 this report memorializes who the seller was, and a
21 list of loans, and under what product they sold it
22 to at that time.  So it's created at the time we buy
23 it.
24 Q   So this -- I know you said this report is
25 not created or pulled from MIDAS, correct?

---

**21**

1    A    Correct.
2    Q    And you said it was pulled from the
3    seller's systems that you use; is that correct?
4    A    So when the seller transmits data for the
5    loans they're going to purchase or sell to
6    Freddie Mac, it goes from their system to our
7    system. It's called The Selling System. And that
8    data is housed in -- again, all the loan-level data
9    is housed in our corporate data warehouse. This
10   Funding Details Report is generated from that
11   information.
12   Q    Okay. And The Selling System you're
13   referring to, does that have a name other than
14   calling it The Selling System?
15   A    It's called The Selling System.
16   Q    Okay. Is there any way to tell when
17   documents are generated from The Selling System and
18   not from MIDAS?
19   A    So as I stated, this is not generated from
20   The Selling System. So when the seller transmits
21   data on loans that they're selling to Freddie Mac,
22   that data is housed in our corporate data warehouse.
23   That corporate data warehouse is where the data
24   and -- that generates this Funding Details Report
25   comes from.

---

**22**

1    Q    Okay. I'm just trying to get an idea. So
2    is this Funding Details Report manually created,
3    like, by human entry, or is it just, you know --
4    it's not drawn from a system and just printed,
5    correct?
6    A    It's automatically created at the time we
7    purchase the loans from the data that the seller has
8    remitted, transmitted to Freddie Mac, and housed in
9    our corporate data warehouse.
10   Q    So the information is entered by the
11   seller, and Freddie Mac generates this report?
12   A    So the information is created by the
13   seller, transmitted to Freddie Mac through
14   The Selling System. That data is housed in our
15   corporate data warehouse once we purchase the loans,
16   and that data generates this report.
17   Q    Okay. So somebody at Freddie Mac creates
18   this report?
19   A    Correct.
20   Q    Does Freddie Mac do anything to
21   independently verify the information that's provided
22   to you by a seller?
23   A    Yes.
24   Q    What do you do?
25   A    So when we purchase a loan, the original

---

**23**

1    note is delivered to a third party. It's called our
2    document custodian. That custodian reviews the
3    information on the original note, compares that to
4    the data that the seller is transmitting to
5    Freddie Mac to state I'm selling you this loan with
6    these particular details. They compare that to the
7    information in the original note, and if the
8    information is consistent, they certify that that
9    note is consistent with the data, and that triggers
10   us to purchase the loan.
11   Q    And in this circumstance, who was your
12   document custodian?
13   A    At the time the loan was originated,
14   Washington Mutual was the document custodian.
15   Q    So then if I understand that correctly,
16   Washington Mutual was not only the seller, but the
17   one that also -- the document custodian hired by
18   Freddie Mac to verify the information they provided
19   to Freddie Mac to certify that it was a true and
20   correct copy and compare it with the note?
21        MR. MADDOCK: Objection, form.
22   A    Yes.
23   Q    So WAMU certifies its own statements, and
24   Freddie Mac acted upon that certification to
25   purchase this loan?

---

**24**

1        MR. MADDOCK: Objection, form.
2    A    So yes, the document custodian, which this
3    case was a entity within Washington Mutual Bank, was
4    under contract to Freddie Mac to provide those
5    services.
6    Q    So when I ask my question of whether or not
7    Freddie Mac independently verifies the information,
8    that answer is actually (inaudible) --
9        (The court reporter requested clarification
10   regarding the question.)
11   Q    -- incorrect, because Freddie Mac does not
12   independently verify this information? It has the
13   seller verify the seller's information before
14   Freddie Mac purchases the loan?
15   A    So that's not correct. So we contract with
16   a third party. In this case, an entity within
17   Washington Mutual. It's a separate company from the
18   seller -- to -- and we contract with them to do that
19   verification for us. And they're under contract to
20   do that.
21   Q    And in simpler form (phonetic), Washington
22   Mutual verified the information that Washington
23   Mutual provided you, and then you acted upon that
24   certification to purchase that loan without
25   Freddie Mac doing anything on its own to verify that

Transcript of Dean Meyer, Corporate Designee
Conducted on December 7, 2018

25

1 information?
2     MR. MADDOCK:  Objection, form.
3     **A  So, again, we rely on the custodian that we**
4 **hire, whether it's Washington Mutual or another**
5 **party, to verify that information, and they're under**
6 **contract to do that for us, and we rely on that**
7 **information.**
8     Q   So Washington Mutual verified Washington
9 Mutual's information, and you relied on it?
10     MR. MADDOCK:  Objection, form, and asked and
11 answered.
12     MR. MARTINEZ:  He hasn't really answered my
13 question.  It's a yes or no.
14     Q   So did you hire Washington Mutual to verify
15 the information Washington Mutual was providing you,
16 and then you relied on that information?
17     MR. MADDOCK:  Objection, form.
18     **A  Yes.**
19     Q   Okay.  Now, I want to look at -- sorry.  I
20 want to look at Bates stamp 116.  If we can go to
21 that one.  Now, these look to be two separate
22 screenshots.  They don't look like page 1 of 2 and 2
23 of 2.  They both appear to be -- well, I guess we'll
24 go in order.  That top screenshot, can you tell me
25 what that is?

26

1     **A  So they are separate screens within MIDAS.**
2 **The first screen -- the top screen says -- it's**
3 **called S, slash, S, so seller, slash, servicer**
4 **profile inquiry.**
5     Q   Okay.  And what does this screenshot tell
6 me?
7     **A  So this identifies with a particular**
8 **seller/servicer number.  In this case, the 145046**
9 **identifies who that is currently in our system.**
10     Q   Okay.  And is there a way to tell when this
11 screenshot was, I guess -- when the screenshot was
12 taken?
13     **A  So, yes, on the top right-hand corner it**
14 **has a date of 12/12/2017, is the date this**
15 **screenshot was generated.**
16     Q   Okay.  And like we talked about before,
17 when the information is changed in the corporate
18 data warehouse, that information reflects in the
19 screenshots, obviously, after those changes were
20 made, right?
21     **A  Yeah, so once the data in the corporate**
22 **data warehouse is changed for any field on any loan,**
23 **if that field is a loan that's captured in MIDAS,**
24 **the new information would be reflected in MIDAS.**
25     Q   Okay.  And that's why the seller/servicer

27

1 number here is 145046, which is what was previously
2 used to identify Washington Mutual, and now
3 identifies JPMorgan Chase as of December 12, 2017?
4     **A  Yeah, at the time of this screenshot that**
5 **is what the information reflected, yes.**
6     Q   Okay.  Is there a way to access -- well,
7 let me ask this question differently.  Does this
8 screenshot just identify who a servicer for
9 Freddie Mac is, but it's not tied to a particular
10 loan?
11     **A  Correct.  So this -- every loan in MIDAS**
12 **that has a seller number of 145046 -- this is how we**
13 **would reference to see who is the entity that is**
14 **associated with that ID.**
15     Q   Okay.  So this is, effectively, a catalog
16 of -- these are the servicers for Freddie Mac and
17 here are their unique identifiers?
18     **A  That sounds accurate, yes.**
19     Q   Okay.  And on the screenshot at the top on
20 116 it says status, colon, suspended.  Can you tell
21 me why that's there?
22     **A  So if status is suspended, that shows that**
23 **the seller number, so the 145046, is suspended,**
24 **meaning we are not allowing that ID to be used to**
25 **sell loans to Freddie Mac at the time -- at least at**

28

1 the time we were looking at this.
2     Q   Is there any way to tell when this --
3 again, here, I'll use this as a comparison.  In the
4 second screenshot on the bottom it looks to be
5 similar, but it says status:  active.
6     **A  Right.  So that is a separate screenshot of**
7 **a seller/servicer profile using the identification**
8 **number.  I believe it's 877963.  So that identifies**
9 **who the -- in this case, the seller or servicer that**
10 **is associated with that number.  And in that case,**
11 **that number is -- status is active.**
12     Q   Okay.  Now, when comparing the statuses, is
13 there any way to tell -- well, here is another
14 question.  Are there any other statuses that can be
15 reported on these screenshots other than active or
16 suspended?
17     **A  I believe those are the two options.**
18     Q   Okay.  So then I would assume if it's not
19 suspended, it is active then, since those are the
20 only two options?
21     **A  That's my understanding, yes.**
22     Q   Okay.  So, now, on the first screenshot is
23 there any way to tell at what point that status was
24 reflected -- well, changed from active to suspended?
25     **A  Not on this particular screen, no.**

Transcript of Dean Meyer, Corporate Designee
Conducted on December 7, 2018

29

1   Q   How would I find that out?
2   A   Again, similar to when the timing of the
3   name associated with that ID changed from
4   Washington Mutual to JPMorgan Chase, I would look
5   for that same information in the same place that
6   would identify when that identification number was
7   suspended.  But it would not be housed in this
8   screen on MIDAS.
9   Q   Is there a particular screen or a separate
10  area or report within MIDAS or generated by
11  Freddie Mac that would tell me that information?
12  A   So there would be a way to identify when
13  that change occurred.  I currently do not recall
14  today where that would be, but I could get it.
15  Q   Okay.  And then what I'm going to do is
16  leave a spot in the transcript for you to fill in
17  later once you find that information.  And then once
18  you get a chance to review, I'd like you to fill
19  that information in for me.  Can you do that?
20  Because that's something that I would like to know.
21      MR. MADDOCK:  We'll see about that, but go
22  ahead and leave your blank in the transcript.
23      MR. MARTINEZ:  Very well.
24  (The following lines were intentionally left blank.)
25

30

1
2
3
4
5   Q   So now I want to look at that second
6   screenshot on that same page, 116.  So it looks to
7   me that when you compare the top screenshot with the
8   bottom screenshot, they both identify a
9   seller/servicer name, I guess is how we're using
10  that distinction, as JPMorgan Chase Bank, NA,
11  correct?
12  A   Correct.
13  Q   Okay.  And both of these screenshots were
14  taken on December 12, 2017, right?
15  A   That's correct.
16  Q   And there's no way to independently tell on
17  this screenshot when the seller/servicer number
18  changed or was modified for JPMorgan Chase, correct?
19  This screenshot won't tell me that?
20  A   So if that identification number was ever
21  changed, the particular name for it would not be
22  identifiable in this screenshot, correct.
23  Q   Okay.  Now, the second screenshot says it's
24  page 1 of 11.  What are the other ten pages that
25  would follow this screenshot?

31

1   A   So JPMorgan Chase has multiple
2   identification numbers that they use to be
3   identified as a servicer of loans for Freddie Mac,
4   so there would be separate screens for other
5   identification numbers that JPMorgan Chase has.  In
6   this case, there's ten more pages of those.
7   Q   So, essentially, if I understand your
8   testimony, JPMorgan Chase would have 11 different
9   six-digit identifiers for (inaudible) --
10      (The court reporter requested clarification
11  regarding the question.)
12  Q   -- acting as a servicer on behalf of
13  Freddie Mac?
14      MR. MADDOCK:  I'm going to object on whether
15  that accurately reflects his prior testimony.
16      Go ahead.
17  A   So there would be 11 more pages.  I would
18  not be able to know, standing here, whether that
19  would have one identification number per page to
20  know if there was exactly 11.
21  Q   Okay, but -- I understand that, but you are
22  saying that JPMorgan Chase has got multiple
23  six-digit identifiers in the MIDAS system, correct?
24  A   Yes.
25  Q   Why would it have multiple identifiers for

32

1   JPMorgan Chase in the MIDAS system?
2   A   So it's at the seller or servicer's
3   discretion.  They -- typically, they like to
4   identify pools of loans that they service or are
5   under contract that they have sold us to track them
6   separately, and those identifiers help them to be
7   able to track them within our systems and the
8   reports that we provide them.
9   Q   Okay.  So you leave that up to the
10  servicer?  What, do they file separate applications
11  for additional numbers?  How do they go about
12  obtaining another six-digit identifier other than
13  one they were originally given?
14  A   So you're correct.  They would submit a
15  request to be provided an additional identification
16  number that they would like to use to track either
17  the selling or servicing of a particular set of
18  loans.
19  Q   Okay.  And in this circumstance, these
20  additional ten pages that would be behind the
21  screenshot or within the system would likely
22  identify whatever other servicer numbers they
23  decided to apply for?
24  A   Yes.
25  Q   Now, I want to go back up to the top

Transcript of Dean Meyer, Corporate Designee
Conducted on December 7, 2018

---

33

1  screenshot where it says suspended. Does that
2  status, suspended, mean that JPMorgan Chase is not
3  allowed to service loans under that servicing number
4  for Freddie Mac?
5      **A   Well, it reflects that they're not**
6  **allowed -- so, correct, so there are no loans that**
7  **JPMorgan Chase is allowed to sell or service for**
8  **Freddie Mac under that identification number.**
9      Q   Okay.  Then, again, I go back to when was
10  this identification number that JPMorgan is now --
11  was functioning under, when was it suspended?
12      MR. MADDOCK:  Objection, asked and answered.
13      **A   So I believe I answered that.  It would not**
14  **reflect in this screen.  We would have records that**
15  **would reflect the timing of that.  I just don't know**
16  **where that would be housed sitting here, but I could**
17  **get it.**
18      Q   Okay.  Now, when it says that the status
19  here is suspended, does that stop -- and because you
20  mentioned that JPMorgan has multiple servicing
21  numbers that it functions under -- does that stop
22  JPMorgan from servicing for Freddie Mac in its
23  entirety as an entity or just under this servicing
24  number, 145046?
25      **A   Just under that specific ID.**

---

34

1      Q   Okay.  What circumstances would force -- I
2  guess would end up getting the status of a
3  particular servicing number suspended?
4      **A   Well, in some cases it could be at the**
5  **seller's request to say we are no longer going to**
6  **use that identification number to sell you loans, so**
7  **please -- you know, they wouldn't call it suspended,**
8  **but please know we're not going to deliver loans to**
9  **you anymore; we don't wish to deliver loans or**
10  **service loans for you.  That would cause us to put**
11  **it in that suspended category to ensure they don't.**
12  **It could be that they have requested to stop using**
13  **it.  It's usually the seller or the servicer says I**
14  **want to stop using that ID.  Or, in this case, it**
15  **could be that Washington Mutual, when they went**
16  **under receivership of the FDIC, that we suspended**
17  **the ability for anyone with that -- using that ID to**
18  **sell or service loans for us.**
19      Q   Okay.  So you're saying that in this
20  circumstance, when WAMU was taken receivership by
21  the FDIC, and JPMorgan Chase acquired this loan from
22  the FDIC, and that relationship (phonetic), that
23  that would have been the time where this status
24  would have changed from active to suspended for this
25  servicing number?

---

35

1      **A   I did not --**
2      MR. MADDOCK:  Objection, mischaracterizes
3  his testimony.
4      **A   So I did not say it did.  I said that could**
5  **be one of the reasons why identification numbers**
6  **could be suspended.**
7      Q   Okay.  Is there anywhere else in any of the
8  systems that Freddie Mac has where you can go and
9  find out the reason why this seller number was
10  suspended?
11      **A   At a minimum, I could find out the timing.**
12  **Whether there was any reason retained within those**
13  **systems, I would have to look.**
14      Q   Okay.  I'm going to leave a spot in the
15  transcript for you to fill that in there, too,
16  because what I want to know is the reason why this
17  switched to suspended.  If you can find that in your
18  system and identify the system that contains that, I
19  would appreciate it.
20      MR. MADDOCK:  On the record, to make the
21  record clear, he's answered the question, but go
22  ahead.
23      MR. MARTINEZ:  I don't think he's answered
24  the question.  I think he just left it open that he
25  could find it.

---

36

1      Q   So when you go and you find it, I want you
2  to go back into the transcript and review it and
3  fill in that information for me since you were not
4  able to know that today and testify as to that
5  detail today.
6      MR. MADDOCK:  His testimony was that he
7  could find it, not that he was going to find it, but
8  go ahead.
9      MR. MARTINEZ:  Are you saying that he's
10  going to testify to information and then not allow me
11  to go into discovery as to the information he's
12  relying on?
13      MR. MADDOCK:  He's answered the question.
14  Go ahead.
15      MR. MARTINEZ:  Okay.
16  (The following lines were intentionally left blank.)
17
18
19
20
21
22      Q   Now, I want to move on to the document
23  that's Bates-stamped 69.  At the top it says loan
24  status manager.  Do you have that document in front
25  of you?

---

Transcript of Dean Meyer, Corporate Designee
Conducted on December 7, 2018

37

1    A  Yes, I do.
2    Q  Can you tell me what this document is?
3    A  So this is a report.  So it's called a TOS
4  summary report, so TOS stands for transfer of
5  servicing.  It comes from our loan status manager
6  reporting system.  So this is a report that
7  identifies for a particular loan; this case, the
8  loan ending in 2094, which I believe is the loan we
9  are discussing today; shows any transfer of the
10  servicing from one identification number to another.
11    Q  Okay, so this would be the scenario you
12  were referring to before, where that 145046 number
13  that was suspended, that would be a transfer from
14  that number to the new number that JPMorgan Chase
15  would be identified under?
16    A  Correct.
17    Q  Okay.  And where can I see that on this
18  document?  Can you walk me through that?
19    A  So it will show you, if you go from left to
20  right, it has request date.  So that's the date that
21  JPMorgan Chase notified Freddie Mac that they would
22  like to move the servicing of this particular loan
23  from the ID number, 145046, to the new number,
24  877903.  That's the date they requested it.  And the
25  date effective is the date that the servicing moved

38

1  from that original identification number to the new
2  identification number.  So that would be
3  October 16, 2014.
4    Q  Okay.  And you had indicated previously
5  that the 145046 number was suspended and that no
6  servicing would be able to be conducted under
7  that -- under loans that were tagged to that number,
8  correct?
9    (The court reporter requested clarification
10  regarding the question.)
11    A  So what I said is as of the date that this
12  screen was generated, which I believe was
13  December 12, 2017, reflected suspended.  So as of
14  that date, I can tell you no servicer was allowed to
15  service loans under that identification number.
16  Looking at the loan status manager, I will make a
17  statement that up until at least 10/16/2014, the
18  servicer ID number 145046 was in an active status
19  because JPMorgan Chase couldn't have been servicing
20  under that identification number if it was
21  suspended.
22    Q  But you don't know -- again, you testified
23  to previously, you can't tell by looking at any of
24  the documents we have in front of us today when the
25  loan number -- the servicing number 145046 was

39

1  actually suspended?
2    A  Correct.  I can tell you, from looking at
3  this TOS report, that up until 10/16/2014, at a
4  minimum up to that point in time, that ID was
5  active.
6    Q  How do you know that?
7    A  Because no one would be allowed to have
8  loans underneath that identification number if it
9  was in a suspended status.  They would -- it
10  would be -- no loans would be under that
11  identification number if it was suspended.
12    Q  And there's never been a circumstance where
13  a servicer under a suspended servicing number was
14  doing something they weren't supposed to be doing,
15  ever?
16    MR. MADDOCK:  Objection, form.
17    A  So, no, what I'm stating is loans cannot be
18  serviced or sold to Freddie Mac under a particular
19  identification number if it's in a suspended status.
20  So if a number was suspended, the date it was
21  suspended, there would not be allowed to be any
22  loans serviced or sold to us under that
23  identification number.
24    Q  Well, I understand your policy.  What I'm
25  asking is what actually occurred.  There's really --

40

1  there's no way for you to tell whether or not
2  JPMorgan Chase was servicing this loan under a
3  suspended servicing number at any point because
4  these documents don't tell you that information?
5    MR. MADDOCK:  Objection, form.
6    A  So as I stated before, the documents in
7  front of us do not show exactly when that
8  identification number was placed in suspended
9  status, but I could get it.
10    Q  Okay.  Okay, so this -- if I'm looking at
11  this loan status manager report correctly, it looks
12  to me that under the servicer from column, that is
13  the servicer and servicing number that servicing is
14  being transferred away from, correct?
15    A  Correct.
16    Q  Okay.  And in that box it identifies
17  JPMorgan Chase Bank, NA, and then it says formerly
18  known as WAMU.  Is there any way -- well, if this --
19  let me ask this question differently.  Now, the fact
20  that JPMorgan Chase Bank, NA is being identified as
21  formerly known as WAMU, is that due to the transfer
22  or purchase of the assets from the FDIC, the WAMU
23  assets from the FDIC?
24    A  I can't make an assumption, but that sounds
25  logical, but I don't know exact reason why the

Transcript of Dean Meyer, Corporate Designee
Conducted on December 7, 2018

41

1  naming convention is that way.  I can tell you the
2  seller or servicer, in this case, JPMorgan Chase,
3  chose to identify that ID with that naming
4  convention.
5      Q   Okay.  Well, because I have a question
6  about is this -- does this just reflect the fact
7  that there was something changed in the system,
8  meaning that instead of 145046 identifying
9  JPMorgan Chase only, that, you know, somebody at
10 Freddie Mac one day, or at the request of the
11 servicer, requested that the identification under
12 145046 be changed to JPMorgan Chase Bank, NA,
13 formerly known as WAMU?
14      MR. MADDOCK:  Objection, form.
15  A   No.  I'm stating that the entity, in this
16 case, JPMorgan Chase, used that naming convention
17 for that particular identification number.  That's
18 all it shows.
19     Q   Okay.  And is there any way -- or can you
20 tell me who the servicer for this loan was at the
21 time you acquired it?
22  A   So the time we acquired it was
23 Washington Mutual.
24     Q   Okay.  So Washington Mutual was the
25 servicer for the loan.  And when did you say

42

1  Freddie Mac acquired it?
2      A   Freddie Mac acquired the loan, I believe,
3  on July 13, 2000- --- well, it would be on the --
4  MIDAS screen would reflect that, but it's
5  September 13, 2006.
6      Q   Okay.  So WAMU was the servicer from
7  July 2006 forward.  How do I know when
8  JPMorgan Chase took over as the servicer?
9      A   So these screens would not reflect the
10 timing of the change from Washington Mutual to
11 Chase because Washington Mutual took over the
12 existing number it was serviced under.  So,
13 remember, MIDAS only reflects the current entity, so
14 I -- similar to knowing when the loan was suspended
15 or the exact time of that change, it would be
16 reflected in other records, but not these that we're
17 looking at.
18     Q   Well, you said -- I think you testified
19 previously that this loan status manager, the TOS
20 summary report, specifically deals with transfers in
21 servicing, correct?
22  A   Correct.
23     Q   And that would house all the information
24 related to all the transfers of servicing related to
25 a particular loan?

43

1      A   Well, it would reflect any change in the
2  identification number which the loan was serviced
3  under.  So in this case, when Chase took over the
4  servicing of this loan, they continued to use the
5  same identification number, so there would be no
6  change reflected in this report because it's --
7  continued to be serviced under this same
8  identification number until October 16th of 2014.
9      Q   Is there any way to get this TOS summary
10 report at a different date and time?  So if I were
11 to go back in time and say I wanted to know at the
12 date of the foreclosure sale, on July 27, 2012, what
13 this screenshot reflected?
14      MR. MADDOCK:  Objection, form.
15  A   Well, this loan status manager report would
16 only -- right, it pulls data from our corporate data
17 warehouse, which houses the current information on
18 individual loans.  So loan status manager would not
19 be able to go back in history and say what was the
20 status at a certain date.  I would have to look at
21 other records to reflect when that change occurred.
22     Q   And what other records would you look to?
23  A   I'm not sure, but I know that we track when
24 an ID number is changed from one entity to another.
25 This is not the only time this occurs.  And it would

44

1  also -- I would be able to determine, through some
2  report or a system -- again, I'm not sure which --
3  of the timing of the loan being -- that ID being
4  suspended, but I don't have it in front of me.
5      Q   Would you be able to tell through other
6  documents, since this document can't go back in
7  time -- what documents would you use to tell me who
8  the servicer was on July 27, 2012?
9      A   Well, I would be able to tell you the time
10 frame of from when we purchased a loan until that
11 identification number had any change to it.  So
12 let's say from Washington Mutual to Chase, I would
13 be able to identify when that occurred.  And then I
14 could tell you if that identification number was
15 ever changed or when the loan was serviced under a
16 new identification number, which this report
17 reflects.
18     Q   So when you testified that WAMU was the
19 servicer at acquisition July 2006, what information
20 are you basing that off of in order to provide that
21 testimony?
22  A   Well, I --
23     Q   (Inaudible.)
24     (The court reporter requested that Counsel
25 repeat the question.)

45

1    Q   When you testified previously that WAMU was
2 the servicer in 2006 when Freddie Mac acquired this
3 loan, what information did you look at or review in
4 order to testify to that?
5    A   Well, I know that Wells -- I mean that
6 Washington Mutual sold us the loan.  If the loan was
7 being serviced by any other entity and it
8 subsequently transferred to Chase or another entity,
9 that would be reflected here.  In this case, the
10 original seller, which we all know was
11 Washington Mutual -- we identified that with that ID
12 number of 145046 -- was Wells -- I mean
13 Washington Mutual's identification number at the
14 time they sold us the loan, and we know that Chase
15 took over the assets of Washington Mutual sometime
16 in 2008.  That's when the change in servicing would
17 have occurred.
18    Q   So you're inferring that from the
19 information you just gave me, but there is nothing
20 in the MIDAS system that you reviewed before today,
21 or any other system, that gave you that conclusion?
22    MR. MADDOCK:  Objection, form.
23    A   So there would be nothing in MIDAS that I
24 reviewed that would reflect the timing of when
25 Washington Mutual -- Washington Mutual was the

46

1 identifier for that ID number and when that was
2 changed to Chase would not be reflected in the
3 documents I looked at within MIDAS, but I know that
4 I have access to those documents.
5    Q   (Inaudible.)
6    (The court reporter requested that Counsel
7 repeat the question.)
8    Q   And those are the documents that we're
9 leaving a blank in the transcript for if you need to
10 come back in after your review to include that
11 testimony (inaudible) --
12    (The court reporter requested that Counsel
13 check the volume and location of his microphone.)
14    (Off-the-record discussion.)
15    MR. MARTINEZ:  Can you read back what I last
16 said for me?
17    (Pending question read.)
18    MR. MARTINEZ:  That's fine.  I don't
19 actually remember what I said right after that, but
20 that's sufficient for me.
21    MR. MADDOCK:  Same comment, same objection
22 with regards to leaving the blank.
23    Q   Okay.  So now I want to take a look at the
24 documents that are Bates-stamped 1 through 5.
25    A   Okay, I have them.

47

1    Q   Okay.  So at the top it says it's the loan
2 status manager.  So I assume that's the system that
3 this report is generated from?
4    A   That's correct.
5    Q   Okay, and what is this five-page document?
6    A   Well, it's called a mortgage payment
7 history report.  So this is a report that shows all
8 of the monthly reporting that the servicer did on
9 this loan since the time we purchased it up until
10 the date of this report, which was identified as
11 December 12, 2017.
12    Q   Okay.  Now, I want to go back and look at a
13 couple of entries that are in the report.  If you
14 could turn to the second page, there is a -- there's
15 two boxes on the right-hand side about
16 three-quarters of the way down.  One of them says
17 third-party foreclosure sale, and then it has a date
18 next to that.  Do you see that?
19    A   Yes.
20    Q   Can you tell me why that information is
21 entered into the report?
22    A   So the report reflects information that the
23 servicer reports to us on a monthly basis.  So in
24 this case, on that date -- so if you look at the
25 date on -- if you go from left to right on this

48

1 second column, on December 12, 2012, the servicer
2 reported to us that a foreclosure sale occurred and
3 it was sold to a third party.  That's what that data
4 reflects.
5    Q   Okay.  And on that same line -- I'm going
6 to use the column identifiers -- there's a column
7 there that's right next to the redacted one, to the
8 left of it, and that column carries a title of
9 proceeds.  Do you see that on the first page?
10    A   Yes.
11    Q   Okay.  And then if we track that all the
12 way down to this loan we were just talking about,
13 which looks like the date reported was
14 December 6, 2012, it indicates that the proceeds
15 there were $196,626.55.  Do you see that?
16    A   Yes.
17    Q   What does that entry reflect?
18    A   So that entry reflects the bid price that
19 the servicer reported to us that the property sold
20 for and the information that they reported to us.
21    Q   Okay.  And so all the information that's
22 included in this mortgage payment history report,
23 who enters that information?
24    A   So it's -- the servicer reports it to us.
25 That data goes into, again, our corporate data

**49**

1 warehouse where all the loan-level data is created,
2 and when we go into loan status manager to generate
3 this report, it pulls the data that the servicer had
4 reported to us, that's housed in our corporate data
5 warehouse.
6    Q   Okay, but the servicer is the entity that
7 inputs this information in the first place? That's
8 who it comes from?
9    A   Yeah, they report that data to us, correct.
10   Q   Okay. And do you know how they report
11 their -- or input all that information?
12   A   So this particular data is reported
13 through -- it's called DWR. That's just an acronym.
14 So that's the way they transmit that data to
15 Freddie Mac on a -- this is where they can report
16 data to us daily.
17   Q   Okay. That's the mechanism how it gets
18 there, but -- so do you know what DWR stands for?
19   A   It's an acronym, but I don't recall what
20 the acronym stands for.
21   Q   Okay. And is that the system that the
22 servicer is entering information into, which then
23 ultimately transfers to Freddie Mac?
24   A   Well, they don't enter -- they -- from
25 their servicing system they would feed that data

**50**

1 from their system directly to -- through DWR into
2 our corporate data warehouse, where that data would
3 be received.
4    Q   Okay, so DWR is, essentially, the medium by
5 which the information in the servicer's system gets
6 transferred to Freddie Mac?
7    A   Yeah. It's the portal that they would go
8 to to transmit that data.
9    Q   Okay. When the servicer inputs their
10 information, and in this circumstance it's either
11 WAMU or JPMorgan Chase -- when they input their
12 information into their own system, do you know how
13 they do that?
14   A   No.
15   Q   So you don't know whether or not they are
16 manually entering every month the principal,
17 interests, and all that stuff, or whether or not
18 some of that is automatically generated?
19   MR. MADDOCK: Objection, foundation.
20   A   Correct, I don't know how the servicer
21 generates that data.
22   Q   Okay. So I want to take another look at
23 page 3 of this document -- or Bates stamp 3. Sorry.
24   MR. MADDOCK: And Mr. Martinez, we have
25 been -- I don't want to cut you off. We've been

**51**

1 going, I think, probably, more than an hour at this
2 point. If there's a natural spot to take a quick
3 break, that would be great, but...
4    MR. MARTINEZ: Yeah, that's fine. We can do
5 that now if you want. We'll just come back to this
6 when we're done. Want to take a quick ten-minute
7 break? Or if you need any more than that, just let
8 me know.
9    MR. MADDOCK: Okay. Ten minutes.
10   MR. MARTINEZ: Perfect. Thank you.
11   (Off the record.)
12 BY MR. MARTINEZ:
13   Q   Okay, so before we went off the record and
14 took a break, we were looking at the document that's
15 Bates-stamped 3, so if you could turn to that page
16 for me in case you moved away from it.
17   A   I'm there.
18   Q   Okay. And on the right-hand side again
19 there's another column with what looks to be like a
20 separate entry that says inactive (sic) loan, and
21 that looks to be on the date of reporting of
22 January 20, 2011. Do you see that?
23   A   Yes.
24   Q   Okay. What does that entry mean?
25   A   So our servicers are required to remit to

**52**

1 Freddie Mac the interest that's due on the loan
2 every month regardless of whether the borrower is
3 making payments or not. Once the loan becomes a
4 certain age of delinquency, at least 120 days
5 delinquent, the servicer has the ability to stop
6 passing through that interest. And if they choose
7 to do it, though, that is the timing of when they do
8 that. So that inactivate loan means they're
9 inactivating the requirement to pass through
10 interest for Freddie Mac going forwards. That's all
11 that is.
12   Q   Okay. So then in order to -- okay, so when
13 they put this entry in, this is something done by
14 the servicer, correct, this inactive loan?
15   A   So the servicers report a code to us, so a
16 code that says I wish to inactivate this loan,
17 meaning -- and that means that they want to stop
18 remitting interest to Freddie Mac on this particular
19 loan, and that reflects that information.
20   Q   Okay. And then that would have occurred --
21 and based on this document, that occurred on
22 January 20, 2011?
23   A   Correct.
24   Q   And is there -- so in order to -- well,
25 here's this question: Is there anywhere else on

Transcript of Dean Meyer, Corporate Designee
Conducted on December 7, 2018

14 (53 to 56)

---

53

1  these documents -- since this document was printed
2  December 12, 2017, we can say that, I guess, this
3  information reports all the way up to -- the most
4  recent date reported on the first page is
5  November 17, 2017. So between January 20, 2011 and
6  November 17, 2017, is there anything on this
7  document which indicates that the loan was
8  reactivated by the servicer, where they would start
9  remitting interest payments to Freddie Mac again?
10 A  So if--
11     MR. MADDOCK: Objection, form.
12 A  So if they had, you would see the row and
13 the timing of that, and it would actually say
14 reinstatement. And that would trigger -- that would
15 identify -- reflect when they requested that they
16 want to start remitting principal or interest to
17 Freddie Mac going forward. And that would be
18 reflected similar to where it says inactivate loan.
19 There would be a line that says reinstatement, and
20 then you would see them passing through principal
21 and at least interest going forwards.
22 Q  Okay, so then --
23 A  In this case there is none.
24 Q  Right, so they never -- so the servicer, in
25 this circumstance, never reactivated this loan?

---

54

1  A  Correct.
2  Q  Or at least all the way up until
3  November 17, 2017. We don't know what it is today,
4  but...
5  A  So, yeah, that's the accounting cycle,
6  so -- and, again, this is monthly report, so
7  this -- report to us monthly, but as of that
8  accounting cycle in November of 2017 they had not
9  reinstated the loan in our system to start passing
10 through payments or interest.
11 Q  Okay. And where -- which column on this
12 document does it show you that the servicer is
13 remitting payments of the interest to Freddie Mac?
14 A  So where you see one, two, three, four,
15 five, six, seven, and eight -- the seventh and
16 eighth column it says principal due and interest
17 due?
18 Q  Yeah.
19 A  If you go through -- down on those on each
20 individual page, right up to the row that says
21 inactivate, that --
22 Q  Yup.
23 A  -- you'll see that in that particular
24 accounting cycle they remitted $963.45. That's the
25 interest that was due Freddie Mac. And then you can

---

55

1  see subsequent -- I mean prior to that there is one,
2  two, three, four -- for five months that they
3  remitted interest and no principal. And then before
4  that, you can see principal and interest being
5  remitted to Freddie Mac all the way back to when the
6  loan was purchased by us.
7  Q  So then if I understand that correctly, and
8  correct me if I'm wrong -- so the five months it
9  looks like that there was no principal remitted,
10 that would be because the borrower stopped paying,
11 correct?
12 A  So doesn't necessarily state that. It just
13 states that the servicer remitted interest to us,
14 because -- so that our loans are -- well, they're
15 scheduled out, meaning they have to send us the
16 scheduled interest that's due us and any actual
17 principal they receive from the homeowner. So in
18 this case, for those five months they did not
19 receive any principal from the homeowner, because
20 they're required to report it to us and remit it.
21 But they did remit interest to us. Whether that
22 came from the borrower or not, Freddie Mac does not
23 know.
24 Q  Okay. And what requires the servicer to
25 remit the interest to Freddie Mac?

---

56

1  A  So that's the terms under which they
2  service loans for Freddie Mac. And our guide, which
3  is our contract, specifically requires them to --
4  and, again, all our loans are most of our loans are
5  on a scheduled actual remittance, which means you
6  have to remit these scheduled interests due us every
7  month up until a time the loan pays off or you
8  inactivate the loan, and it gives -- sets forth the
9  terms under which they can inactivate the loan. So
10 they have to follow that.
11 Q  So you had mentioned the guide. Is there a
12 separate document that governs the relationship
13 between Freddie Mac and its servicer?
14 A  Well, the guide, as far as seller/servicer
15 guide, is the contract under which sellers and
16 servicers can either sell and service loans for us.
17 They have to comply with those requirements in that
18 document. That's our contract.
19 Q  Does the servicer and Freddie Mac, or even
20 the seller in that circumstance, ever sign the
21 guide? I've never seen there be a signature block
22 for the guide.
23 A  No. So when they become an eligible seller
24 or an eligible servicer, or both, we get a signature
25 from them on a form that says they will comply with

---

Transcript of Dean Meyer, Corporate Designee
Conducted on December 7, 2018

57

1  the terms of our guide.
2      Q   And what is that form called that you have
3  them sign?
4      A   I don't recall the name of it, but it is --
5  it's either a letter from the head of our sales
6  division or it's a form -- one of those two -- but
7  they would countersign that, saying yes, we agree to
8  comply with those requirements.
9      Q   So then that letter or form you're
10 referring to, they actually sign, that would be the
11 agreement between the parties, and then that would
12 just, what, incorporate the requirements in the
13 guide?
14         MR. MADDOCK:  Objection, asks for a legal
15 conclusion.
16     A   So those would -- that would be a, again,
17 letter or form that says, yes, we -- from
18 Freddie Mac saying you are now an approved seller or
19 servicer; by countersigning this, you agree to
20 comply with the contract, which is our guide.
21     Q   Okay.  Has a copy of that letter or form,
22 whatever was countersigned by the servicer, been
23 produced in this litigation?
24     A   No.
25     Q   Have you ever seen that document?

58

1      A   I have not seen the document for this
2  particular seller or servicer, but I've seen them
3  before.
4      Q   But like I said, you haven't seen the one
5  that would govern the relationship in this -- with
6  this particular servicer, on this particular loan?
7      A   That's correct.
8      Q   Okay.  Now, going back to this document
9  real quick, these entries that we referenced where
10 it says third-party foreclosure sale and inactivate
11 loan, those are, like, manual entries that were put
12 in by the servicer, correct?
13         MR. MADDOCK:  Objection, form.
14     A   No.  So that is data that the servicer
15 reported to us.  They're codes.  And they usually
16 come from their system to our system.  How they're
17 entered into their system, I do not know.
18     Q   Okay.  But these things aren't -- they
19 don't automatically -- the system that the servicer
20 works on doesn't automatically trigger these things?
21 That's something the servicer has to go in and
22 report to Freddie Mac, right?
23     A   Well, the servicer would have to report to
24 us those specific codes.  How they generate those
25 codes, whether it's automated based on other events,

59

1  or someone actually types in a code that gets
2  reported to us, I do not know.
3      Q   Okay.
4          MR. MARTINEZ:  Now, I don't think I have
5  anymore questions, but I just want to -- I mean, I
6  don't know if, John, you're going to have any
7  questions.
8          MR. MADDOCK:  When you wrap up, I might just
9  take two minutes to consider it.
10         MR. MARTINEZ:  Okay.  Yeah, go ahead and do
11 that then.  And, obviously, if I have any others,
12 I'll follow up with that.  And then I wanted to get
13 something on the record before we finish up, after
14 the deposition is concluded.
15         MR. MADDOCK:  Okay.
16         (Off the record.)
17         EXAMINATION BY COUNSEL FOR FREDDIE MAC
18 BY MR. MADDOCK:
19     Q   Mr. Meyer, you testified that Chase
20 purchased certain assets from the FDIC in 2008.  Do
21 you recall testifying to that?
22     A   Yes.
23     Q   And what were the assets that Chase
24 purchased in 2008?
25         MR. MARTINEZ:  Object to the form.

60

1      A   So I don't know all the assets they
2  purchased.  I know that this loan and other loans
3  that Washington Mutual was servicing for us, they
4  purchased the servicing rights of those assets.
5  What other assets, I don't know.
6      Q   Okay.  And with regard to the loan that
7  we've been discussing today, what rights in the loan
8  did Chase purchase from FDIC?
9          MR. MARTINEZ:  Object to the form.
10     A   They purchased the servicing rights.
11     Q   Okay.
12         MR. MADDOCK:  All right, that's -- no other
13 questions.
14         MR. MARTINEZ:  All righty, I don't have
15 anymore questions.
16         I just wanted to make sure, you know, John,
17 since you had an objection to what I was referring to
18 earlier about leaving a blank in the transcript for
19 him to go back and review the documents he said he
20 could go back and review -- I just wanted to make it
21 clear at the end, so that, you know, if there's going
22 to be motion practice, we have a solidified spot in
23 the transcript to refer to, so I don't have to go
24 searching around for it.  Essentially, I understand
25 you disagree, but my position is that -- and,

Transcript of Dean Meyer, Corporate Designee
Conducted on December 7, 2018

61

1  specifically, the two facts I was looking for, that I
2  left blanks open for, were for why the suspension of
3  the servicer number 145046 occurred, and then when
4  that suspension occurred.  And that was because of
5  the fact that based on the documents that Chase
6  produced in this litigation, Mr. Meyer could not
7  testify to that information, but he had indicated
8  that there were other documents he could go to to
9  find that information.  That's the information I
10  want.  And because that's put at issue in this case,
11  I think that that's a relevant fact that I should --
12  I'm entitled to know, because it surrounds the
13  servicing rights and impacts the potential servicing
14  relationship with Freddie Mac and whomever its
15  servicer was at any given time.
16      MR. MADDOCK:  Well, the transcript will say
17  what it says.  If you believe you have rights that
18  you can pursue, you're certainly free to do that, and
19  we would reserve all of our rights in response.
20      MR. MARTINEZ:  Okay.  And I will do the
21  same.  Obviously, that doesn't -- you know, if
22  Mr. Meyer is to go research and fill in the blank in
23  his transcript, as I'm requesting, obviously I'm
24  reserving my rights to respond to that information,
25  if that even has to come back and ask him another --

62

1  you know, a short depo just to respond to the
2  inputted information as he fills in the blank.  I'm
3  reserving my right to do that.
4      MR. MADDOCK:  Okay.
5      MR. MARTINEZ:  Just so you understand.
6      MR. MADDOCK:  And we reserve our rights in
7  response.
8      MR. MARTINEZ:  No problem.  I just wanted to
9  make it clear in the last bit of the record so we
10  could just get that on there.  But that's all I have,
11  so unless there's anything else you have, John, then
12  we're good for the day.
13      MR. MADDOCK:  The only thing I would have is
14  that he would like to read and sign, so...
15      MR. MARTINEZ:  All right.
16      (Off-the-record discussion.)
17      MR. MARTINEZ:  So just going back on the
18  record real quick, I just wanted to attach as
19  Exhibit 1, I guess, to the deposition the four sets
20  of documents that we had gone through this time.  And
21  I'll go through the Bates stamps quickly.  First off,
22  the Bates stamp is Chase, underscore, Cooper,
23  underscore, FHLMC00001 through 5.  Sorry, guys.  I
24  just realized that I did not ask him about pages 6
25  and 7, the ones that followed those first five, the

63

1  ones that you said were cut off to column J.  I just
2  want to ask him a couple questions because I had
3  never seen them before.  But what I'll do is I'll
4  just continue to attach all the documents.  So 1
5  through 7 will be attached.  And then the other
6  Bates stamp is FHLMC59 and 60, FHLMC69, and FHLMC115
7  and 116.
8      FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFF
9  BY MR. MARTINEZ:
10      Q   And then, Mr. Meyer, if I could have you
11  turn to what's Bates-stamped 6 and 7 for me real
12  quickly.  I understand that part of it is cut off.
13      MR. MADDOCK:  And Mr. Martinez --
14      Q   Do you have those documents in front of
15  you?
16      MR. MADDOCK:  Mr. Martinez, before you ask
17  questions, I would note that securitization is not a
18  listed topic, so instead of objecting to every one of
19  your questions as being outside the scope, I'll
20  object now.
21      MR. MARTINEZ:  Oh, if that's what these
22  documents pertain to -- I could not tell that by
23  looking at this.  So if you don't mind, if I could
24  just ask him some foundational questions of what the
25  documents are to confirm that, and then I won't delve

64

1  into a topic that's outside the scope.
2      MR. MADDOCK:  All right, well, the objection
3  stands.  Go ahead.
4      MR. MARTINEZ:  Sure.
5      Q   Mr. Meyer, can you tell me what this
6  document on Bates stamp 6 is?
7      A   So the two documents, page 6 and page 7, is
8  a screenshot of our business records that reflects
9  when a loan was placed into a security, and then
10  when it was removed from a security.  That's what
11  those two pages reflect.
12      Q   Okay.  And this document doesn't have a
13  title on it or a date or anything.  Who prepares
14  these documents?
15      A   So they come from our business records.
16  This is generated at the time of when the loan is
17  removed from a security, that this is what our
18  system generates to reflect that activity.  And then
19  this is housed in -- the data from this is housed in
20  our corporate data warehouse.
21      Q   Okay.  Then based on this document, when
22  can you tell that this loan was removed from the
23  security or removed from securitization?
24      A   So if you look at page 7, in column F, the
25  header is DT mortgage removed, so that's date

Transcript of Dean Meyer, Corporate Designee
Conducted on December 7, 2018

17 (65 to 68)

**Page 65**

1  mortgage removed.  And row 3, it has a date of
2  12/15/2010, so that's the date the loan was removed
3  from the security.
4        MR. MARTINEZ:  Okay.  That's all the
5  questions I had.  So that's all I have, so, yeah, I'm
6  done.
7        (Off the record at 3:50 p.m.)
8        (Meyer Exhibit 1 was marked for
9  identification and is attached to the transcript.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 67**

1  CERTIFICATE OF SHORTHAND REPORTER-NOTARY REPUBLIC
2
3        I, LISA KIRK, the officer before whom the
4  foregoing deposition was taken, do hereby certify
5  that the foregoing transcript is a true and correct
6  record of the testimony given; that said testimony
7  was taken by me stenographically and thereafter
8  reduced to typewriting under my direction; that
9  reading and signing was requested; and that I am
10  neither counsel for, related to, nor employed by any
11  of the parties to this case and have no interest,
12  financial or otherwise, in its outcome.
13        IN WITNESS WHEREOF, I have hereunto set my
14  hand and affixed my notarial seal this 4th day of
15  January, 2018.
16  My commission expires:
17  July 31, 2022
18
19
20
21
22  _____
23  NOTARY PUBLIC IN AND FOR
24  THE COMMONWEALTH OF VIRGINIA
25  Notary Registration Number - 7057881

**Page 66**

1        ACKNOWLEDGEMENT OF DEPONENT
2
3
4        I, DEAN MEYER, do hereby acknowledge that I
5  have read and examined the foregoing testimony, and
6  the same is a true, correct, and complete
7  transcription of the testimony given by me and any
8  corrections appear on the attached Errata sheet
9  signed by me.
10
11
12
13
14
15
16
17  _____   _____
18   (DATE)                (SIGNATURE)
19
20
21
22
23
24
25